Affirmed and Opinion filed June 17, 2004









Affirmed and Opinion filed June 17, 2004.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-00-00079-CV

____________

 

SHAILESH GUPTA,
M.D.,
Appellant

 

V.

 

EASTERN IDAHO
TUMOR INSTITUTE, INC., MUKUND SHAH, M.D., HESARAGHATTA SHAMASUNDER, M.D., S.R.
VENKATESH, M.D., BALCHANDER RAO, M.D., VINOD BHUCAR, M.D., 

and ARVIND BHANDARI, M.D.,
Appellees

 



 

On Appeal from the 269th
District Court

Harris County, Texas

Trial Court Cause No. 97-54316

 



 

O P I N I O N

Shailesh Gupta appeals the jury verdict
rendered in favor of Eastern Idaho Tumor Institute, Inc. for damages based on
breach of fiduciary duty.  Appellant
contends the contract, on which the damages are based, is unenforceable because
(1) the contract is illegal on its face; (2) a condition precedent was not
satisfied; and (3) the non-assignment clause contained in the contract was
violated.  We affirm.

 








Factual
Background

Northwest Radiation Medical Group, Ltd. (ANorthwest@) is a California
limited partnership created in 1991 by four Texas doctors and two California
doctors for the purpose of opening a radiation oncology clinic in the Houston
area.  The six doctors purchased land,
the necessary equipment, and built a specialized building needed to house the
special equipment.  In order to comply
with federal law, the four Texas doctors sold their interest in Northwest to
the two California doctors, retaining only an interest in the land and the
building.[1]  The clinic was open for approximately two
years, from 1992 to 1994, after which Northwest attempted to either sell the
clinic or find another doctor to operate it.  


In the summer of 1995, appellant began
negotiations with Northwest to start his radiation oncology practice in their
vacant, but furnished, building.  The
parties entered into a joint venture agreement effective September 1, 1995,
whereby appellant would Aprovide, and be solely responsible for the
payment of . . . all necessary professional, medical, and administrative
staffing necessary for the successful operation of the Joint Venture,@ and Northwest
would Acontribute all
necessary equipment, office space, and machinery required for the successful
operation of the Joint Venture.@  The parties further agreed to divide the
gross revenues of the joint venture equally. 









Pursuant to the agreement, the billings,
collections, and accounts payable were to be handled by a third-party, Gamma
Management, Inc. (AGamma@), unless and
until appellant provided written notice of intent to perform the billing
himself.  Gamma was controlled by
Northwest, but the two companies were consolidated into Eastern Idaho Tumor
Institute, Inc. (AEITI@) in the fall of
1995.  After the consolidation, EITI took
over the billing, collections, and accounts payable on behalf of Gamma.  Appellant prepared the billing records and
then sent the applicable information to EITI, so it could file the appropriate
medical claims with medicare, the insurance companies, and the patients.  Each month, EITI would send appellant a check
for his one-half share of the gross revenues.

The relationship between appellant and
EITI began to deteriorate when appellant stopped sending billing information to
EITI.  Eventually, appellant started
performing the billing for the clinic himself; however, appellant did not split
the gross revenues received with EITI for the operation of the clinic during
the remaining term of the joint venture. 
In September 1996, the joint venture=s one-year term
expired and the parties began negotiating for appellant either to enter into a
long-term lease for the building and equipment or to purchase the
property.  Negotiations continued for
several months, during which time, appellant did not pay any rent for the
property or equipment and did not divide any of the gross revenues
received.  

Appellant contends he agreed to open the
clinic only because the four Texas doctors promised to refer patients to the
clinic.  On cross-examination, appellant
admitted that no such agreement was in writing; rather, he claimed it was
implied.  According to appellant, the
clinic began to decline steadily when the Texas doctors stopped referring
patients to his clinic.  Two of the six
doctors testified at trialCone Texas doctor
and one California doctorCthere was no agreement for the Texas
doctors to refer patients to appellant once appellant began operating the
clinic.  

EITI attempted on numerous occasions to
evict appellant from the clinic, but because appellant was continuing to treat
patients, it withdrew those attempts.[2]  According to a representative of EITI,
appellant promised to stop taking new patients and that as soon as all the
treatments from his existing patients were concluded, he would vacate the
premises.  This situation continued for
nearly one year before appellant voluntarily vacated the premises in May
1998.  








Procedural
History

EITI filed suit against appellant alleging
breach of the joint venture agreement, breach of fiduciary duty, past-due rent,
and termination of the joint venture agreement. 
It also asked the court to require appellant to give an accounting to
EITI and declare the rights of the parties under the agreement.  Appellant answered, filed a counterclaim
against EITI, and filed a third-party petition against the four Texas doctors,
the two California doctors, and Gamma. 
With respect to EITI, the jury found appellant failed to comply with the
joint venture agreement, failed to comply with his fiduciary duties owed to
EITI, and was liable for rental damages for the equipment.  The jury awarded EITI $247,997 in damages, of
which $62,497 represented damages for breach of fiduciary duty.  The jury also awarded the six doctors $67,200
for unpaid rent for the premises.  The
trial court rendered its final judgment in accordance with the jury=s verdict on
September 30, 1999.

Appellant filed his first motion for new
trial on October 29, 1999 and, after obtaining new counsel, filed a second
motion for new trial on November 1, 1999. 
The trial court overruled appellant=s motion for new
trial on December 10, 1999.[3]  Thereafter, appellant filed a notice of
appeal on December 29, 1999; the appeal, however, was stayed pending the
outcome of bankruptcy proceedings initiated by appellant.  On February 19, 2003, the bankruptcy judge
granted EITI=s motion for summary judgment, holding the
debt owed by appellant to EITI for breach of fiduciary duty in the amount of
$62,497 was non-dischargeable.  Appellant
then continued his appeal before this court on that portion of the damages
awarded by the trial court for breach of fiduciary duty.[4]  








In three issues, appellant challenges the
judgment of the trial court.  Appellant
argues  the joint venture agreement is
unenforceable because (1) it is based on illegal conduct, namely the corporate
practice of medicine; (2) a condition precedent was unfulfilled; and (3)
Northwest transferred its interest in the joint venture agreement to EITI
without his knowledge or approval in violation of the agreement.  Accordingly, appellant contends EITI is
prohibited from collecting any damages for breach of fiduciary duty because the
contract is void.  

Discussion

I.        Illegality
of Contract

In his first issue, appellant contends the
joint venture agreement is unenforceable because it allows the corporate
practice of medicine in violation of the Texas Medical Practice Act.[5]  See Act of May 30, 1993, 73rd Leg.,
R.S., ch. 862, ' 17, 1993 Tex. Gen. Laws 3374, 3388
(repealed and recodified 1999) (current version at Tex. Occ. Code Ann. ' 164.052(a)(17)
(Vernon 2004)).  Appellant argues the
fee-splitting provision found in the joint venture agreement is illegal because
it effectively allows a corporationCEITI (an Idaho
corporation) as successors in interest to Northwest (a California partnership)Cto practice
medicine in Texas, thereby violating the Medical Practice Act.  








As a general rule, a contract to do a
thing which cannot be performed without a violation of the law is
unenforceable.  Phillips v. Phillips,
820 S.W.2d 785, 789 (Tex. 1991); Lewis v. Davis, 199 S.W.2d 146, 148B49 (Tex. 1947); In
re Kasschau, 11 S.W.3d 305, 312 (Tex. App.CHouston [14th
Dist.] 2000, orig. proceeding).  The
purpose of this rule is to benefit and protect the public, not to protect or
punish either party to the contract.  Lewis,
199 S.W.2d at 151; Villaneuva v. Gonzalez, 123 S.W.3d 461, 464 (Tex.
App.CSan Antonio 2003,
no pet.); Kasschau, 11 S.W.3d at 312. 
A contract that could have been performed in a legal manner will not be
declared void because it may have been performed in an illegal manner.  Lewis, 199 S.W.2d at 149.  Where two constructions of a contract are
possible, courts give preference to the construction that does not violate the
law.  Montgomery v. Browder, 930
S.W.2d 772, 781 (Tex. App.CAmarillo 1996, writ
denied); Cross v. Dallas County Flood Control Dist. No. 1, 773 S.W.2d
49, 53 (Tex. App.CDallas 1989, no writ).  Additionally, we presume the contracting
parties are knowledgeable of the law and contract accordingly; thus, Awhere the
illegality does not appear on the face of the contract, it will not be held
void unless the facts showing its illegality are before the court.@  Lewis, 199 S.W.2d at 149; see
Kasschau, 11 S.W.3d at 312.

The Medical Practice Act prohibits a
physician from Aaiding or abetting, directly or
indirectly, the practice of medicine by a person, partnership, association, or
corporation not duly licensed to practice medicine by the board.@  Act of May 30, 1993, 73rd Leg., R.S., ch.
862, ' 17, 1993 Tex.
Gen. Laws 3374, 3388 (repealed and recodified 1999).  A person Apractices medicine@ under the Medical
Practice Act when that person 

(A) . . . publicly profess[es] to
be a physician or surgeon and . . . diagnose[s], treat[s], or offer[s] to treat
any disease or disorder, mental or physical, or any physical deformity or
injury by any system or method or to effect cures thereof; or

(B). . .
diagnose[s], treat[s], or offer[s] to treat any disease or disorder, mental or
physical, or any physical deformity or injury by any system or method and to
effect cures thereof and charge therefor, directly or indirectly, money or
other compensation.   








Act of July 24, 1981, 67th Leg., 1st C.S., ch. 1, '1, 1981 Tex. Gen.
Laws 1, 3 (repealed and recodified 1999) (current version at Tex. Occ. Code Ann. 151.002(a)(13)
(Vernon 2004)).  Under the Medical
Practice Act, when a corporation comprised of lay persons employs licensed
physicians to treat patients and the corporation receives the fee, the
corporation is unlawfully engaged in the practice of medicine.  Flynn Bros., Inc. v. First Med. Assocs.,
715 S.W.2d 782, 785 (Tex. App.CDallas 1986, writ
ref=d n.r.e.); Watt
v. Tex. State Bd. of Med. Exam=rs, 303 S.W.2d 884,
887 (Tex. Civ. App.CDallas 1957, writ ref=d); Rockett v.
Tex. State Bd. of Med. Exam=rs, 287 S.W.2d 190,
191B92 (Tex. Civ. App.CSan Antonio 1956,
writ ref=d n.r.e.); see
Guerrero-Ramirez v. Tex. State Bd. of Med. Exam=rs, 867 S.W.2d 911,
920B21 (Tex. App.CAustin 1993, no
writ).  The purpose of this act is to
preserve the vitally important doctor-patient relationship and prevent possible
abuses resulting from lay control of corporations employing licensed physicians
to practice medicine.  Flynn Bros.
Inc., 715 S.W.2d at 785; Garcia v. Tex. State Bd. of Med. Exam=rs, 384 F. Supp.
434, 438B39 (W.D. Tex.
1974).        

The joint venture agreement, effective
September 1, 1995, between Northwest and appellant provides that the name of
the joint venture shall be ANorthloop
Radiation Therapy Center,@ formed for the specific purpose of
providing radiation therapy to cancer patients. 
Other relevant portions of the agreement include:

5.       Capital and Functions of Each Joint
Venturer.  Neither party hereto is
contributing any initial capital in the formation of this Joint Venture.  Rather, the roles and functions of each Joint
Venture[r] is delineated herein as follows, with such role and function only to
be modified in writing upon unanimous agreement of each party hereto:

a)       Gupta shall provide, and be solely
responsible for the payment of (including all payroll taxes), all necessary
professional, medical, and administrative staffing necessary for the successful
operation of the Joint Venture; . . .

c)       Northwest shall contribute all necessary
equipment, office space, and machinery required for the successful operation of
the Joint Venture; . . .








6.       Income
and Loss.  The gross revenue of the Joint
Venture shall be divided equally to one half for each party hereto.  In this regard, the parties agree that all
billings, collections and accounts payable shall be handled by Gamma
Management, Inc. from its offices located at 867 West Lancaster Blvd[.],
Lancaster California.  Gamma shall open a
bank account for the Joint Venture at a bank mutually agreed upon by the
parties.  Distributions of revenue, if
any, under this Paragraph shall occur on the last day of the month in which
collections are received. [If a]fter ninety (90) days from the date of this
Agreement, Gupta desires to perform the billing himself for the Joint Venture,
he may notify Northwest in writing at least thirty days prior to the
commencement of such activity of his intent to perform same.  All billing function[s] performed by Gupta
hereunder, if any, shall be at the direction and supervision of Northwest
and/or Gamma Management, Inc.  

Appellant relies on Flynn Brothers, to
support his contention that the contract provision was illegal.  In Flynn, the appellants entered into
a partnership with a doctor whereby the appellants acted as the doctor=s exclusive
management agent with the rights to (1) collect 66.67% of the profits, (2)
trade and commercialize on the doctor=s license, and (3)
select the medical staff to work in the hospitals under contract.  715 S.W.2d at 783, 785.  The partnership arrangement was created in an
effort to meet the requirements of the Medical Practice Act and avoid the
practice of medicine by a non-doctor.  Id.
at 783.  Although the parties were
technically partners, the amount of control the appellants exercised over the
doctor=s practice
rendered their relationship more of an employer/employee relationship.  Id. at 785.  The effect of their arrangement was to allow
the appellants to use the doctor=s license to get
contracts to provide emergency medical care and to hire staff for the hospital
emergency rooms, and, in exchange, the appellants received the majority of
profits made through the doctor=s practice of
medicine.  Id.  The court concluded that A[t]he design,
effect, and purpose of the management agreement contravene[d] the Medical
Practices Act@ and therefore was unenforceable.  Id.

Appellant argues that, like the parties in
Flynn, he and Northwest, EITI=s
predecessor,  entered into an illegal
contract, which allowed a partnership, composed of doctors not licensed to
practice in this state, to receive one-half of the gross revenues from
appellant=s radiation oncology practice.  Appellant also argues the joint venture
structure does not disguise the effect of the agreement, which is an attempt to
indirectly commit the unlawful corporate or unlicenced practice of
medicine.  Thus, appellant concludes the
joint venture agreement is unenforceable because it violates the Medical
Practice Act.








Flynn, however, is
distinguishable because EITI=s relationship
with appellant did not rise to the level of control present in Flynn.  Here, EITI was not permitted to trade or
commercialize on appellant=s license.  Here, appellant had the authority to hire and
fire his medical staff as he saw fit. 
Indeed, appellant complained EITI failed to provide additional staff to
help prepare the billing.  EITI=s representatives
testified their frustrations with appellant stemmed from the manner in which he
chose to run his practice, further demonstrating appellant was given full
control over his practice.  Specifically,
EITI=s initial function
under the contract was to collect the billing receipts from medicare, insurance
agencies, and individuals.  EITI
preferred and requested that appellant provide billing records on a daily
basis, so that the stream of income would be constant and the strict billing
requirements of the government and insurance agencies would be followed.  Appellant, however, preferred to complete the
billing records at the end of the treatment cycle, which occurred after six to
eight weeks of treatment.  EITI complied
with appellant=s wishes and collected the billing
receipts on appellant=s terms. 


The joint venture agreement also provided
that each party had the right to engage in other business opportunities,
regardless of whether the other opportunities were in direct competition with
the joint venture.  The parties were not
required to offer the opportunity to the joint venture and were not required to
share any profits, which further demonstrates the parties= agreement and
intentions that appellant would have full control over his practice, sharing
only in the profits associated with the joint venture.  








In Watt v. Texas State Board of Medical
Examiners, 303 S.W.2d 884 (Tex. Civ. App.CDallas 1957, writ
ref=d) and Rockett
v. Texas State Board of Medical Examiners, 287 S.W.2d 190 (Tex. Civ. App.CSan Antonio 1956,
writ ref=d n.r.e.), the
courts determined the doctors were permitting or allowing non-doctors to use
their licenses to practice medicine.  Watt,
303 S.W.2d at 887; Rockett, 287 S.W.2d at 191.  In each of these cases, the doctor worked for
a clinic owned by non-doctors and was paid a set salary for rendering his
services.  Watt, 303 S.W.2d at
887; Rockett, 287 S.W.2d at 191. The clinics charged and collected all
the fees on behalf of the doctors, and the clinics had the right to fire the
doctors as they saw fit.  Watt,
303 S.W.2d at 887; Rockett, 287 S.W.2d at 191. Additionally, in Watt,
the clinic was placing advertisements on behalf of the doctor.  Watt, 303 S.W.2d at 886.  In each case, the court determined the doctor=s actions
permitted or allowed another to use the doctor=s license or
certificate to practice medicine for the purpose of treating or offering to
treat, sick, injured, or afflicted human beings, in contravention of the
Medical Practice Act.[6]  Watt, 303 S.W.2d at 887; Rockett,
287 S.W.2d at 191.

This case is more closely aligned with Woodson
v. Scott & White Hospital, 186 S.W.2d 720 (Tex. Civ. App.CAustin 1945, writ
ref=d w.o.m.).  In Woodson, Dr. J. M. Woodson entered
into a contract with Temple Sanitarium (ATemple@), in which Temple
agreed to convey a piece of property to Dr. Woodson and Dr. Woodson agreed to
erect, at his expense, a building to be known as AThe Woodson Eye,
Ear, Nose and Throat Hospital.@  Id. at 721.  Pursuant to the contract, Dr. Woodson would
occupy one portion of the building and Temple would occupy the remaining
portion.  Id.  Temple agreed to refer all patients needing
specialized treatment to Dr. Woodson and to reimburse Dr. Woodson twenty-five
percent of the cost of the land and the cost to construct the building.  Id. 
The parties further agreed Temple would be entitled to twenty-five
percent of the net income from Dr. Woodson=s practice.  Id. 
The contract allowed Temple to exercise an option to purchase Dr.
Woodson=s interest in The
Woodson Eye, Ear, Nose and Throat Hospital when the contract expired.  Id. 
Temple thereafter changed its corporate name to Scott & White
Hospital (AHospital@).  Id. 
However, because the cost of construction was greater than anticipated,
the parties amended the contract to give the Hospital a one-third interest in
Dr. Woodson=s practice.  Id. 









During the term of the contract, Dr.
Woodson passed away, but his sons and associates, Drs. W. B. and B. P. Woodson,
succeeded to his interest, and the Hospital continued the contract with Dr.
Woodson=s sons.  Id. 
Nearly ten years later, the Hospital gave Drs. W. B. and B. P. Woodson
written notice of its intent to purchase their interest under the terms of the
contract; however, W.B. Woodson refused to comply.  Id. 
W.B. Woodson filed a lawsuit to partition his interest from the
Hospital, and the Hospital counterclaimed for specific performance of the
contract.  Id.  W.B. Woodson contended the contract the
Hospital sought to enforce was illegal and void because it allowed the
Hospital, a private corporation, to engage in the practice of medicine.  Id. at 724. 

The Woodson court held the contract was enforceable
because the doctors= relationship with the Hospital was more
in the nature of an independent contractor and not an agent or employee.  Id. at 725.  The court held the splitting of gross
revenues was merely payment of rent and compensation for the Hospital=s referral
services.  Id.  Important to the court=s decision was the
fact that:

the Woodsons were entirely
independent of the Hospital as to diagnosis, treatment of patients, and
operations to be performed, using their own independent judgment in all such
matters.  They fixed and collected their
own fees from their patients, kept their own books, accepted full
responsibility to their patients for the nature and character of their services
to them . . . Under such circumstances we think it is clear that they did not
act as agents or employees of the corporation; that their acts were not the
acts of the corporation; and that the corporation as such was not engaged, in
so far as said contract is concerned, in practicing medicine through them as
its agents.  

Id. at 725.

Unlike Flynn, Watt, and Rockett,
EITI did not exercise the level of control over appellant that made their
relationship, in effect, one of employer/employee.  EITI did not have the exclusive management
rights over appellant=s license and did not enter into contracts
with third parties for appellant to provide his medical services.  Appellant and his chosen staff provided the
medical services as he desired, appellant prepared the billing in the manner he
chose, and then appellant provided the billing records to EITI for collection
pursuant to his timetables.  Appellant,
however, eventually took over the billing aspect as well.  EITI provided appellant with one-half the
gross revenues received, but when appellant began collecting billing receipts,
he did not provide gross revenue splitting as EITI had done.








Appellant was completely independent of
EITI as to diagnosis, treatment, and operation of the clinic, using his own
judgment in all such matters.  Appellant
fixed his own fees, kept his own books, and was fully responsible to his
patients for the nature and character of his services rendered to them.  Under these circumstances, the parties= relationship is
more that of an independent contractor and not that of an
employer/employee.  We hold EITI was not
engaged in the corporate practice of medicine, and therefore, the joint venture
agreement was valid.  Accordingly, we
overrule appellant=s first issue.  

II.       Breach
of Contract

In his second and third issues, appellant
contends the joint venture agreement is unenforceable because EITI breached the
contract by (1) failing to fulfill a condition precedent and (2) receiving its
interest in the joint venture agreement by assignment in violation of the agreement=s
non-assignability provision.  

Appellant=s argument is
based on the following two provisions contained in the joint venture agreement:

$                  
This
document becomes valid only if the attached amendment is also signed by both
parties and the sum of $18,000 is delivered to Shailesh Gupta as noted per
terms of the promissory note.

$                  
Assignment.  Because of the personal relationship between
the parties hereto, each is specifically prohibited from selling, assigning,
transferring, or hypothecating his/its interest in the Joint Venture, or the
Joint Venture=s assets to any person, firm or
corporation, other than the other parties hereto, nor may the interest of any
of the parties in the Joint Venture or the Joint Venture=s assets be transferred by
operation of law, except upon the death of Gupta.  








If a contract is unambiguous, the court
must interpret the contract and determine whether a party has breached the
contract as a matter of law.  Meek v.
Bishop Peterson & Sharp, P.C., 919 S.W.2d 805, 808 (Tex. App.CHouston [14th
Dist.] 1996, writ denied); Garza v. Southland Corp., 836 S.W.2d 214, 219
(Tex. App.CHouston [14th Dist.] 1992, no writ).  A trial court should not submit a pure
question of law to the jury, but it may submit a question that asks the jury to
resolve a factual dispute regarding a party=s failure to
perform  according to the terms of the
contract.  Meek, 919 S.W.2d at
808; Lindgren v. Delta Invs., 936 S.W.2d 422, 427 (Tex. App.CAustin 1996, writ
denied).  When the evidence is undisputed
or the evidence conclusively proves performance or non-performance of the
contract terms, the trial court should not submit the issue to the jury.  Bank One, Tex., N.A. v. Stewart, 967
S.W.2d 419, 432 (Tex. App.CHouston [14th
Dist.] 1998, pet. denied).     

Generally, when one party to a contract
commits a material breach of that contract, the other party is discharged or
excused from further performance.  Mustang
Pipeline Co., Inc. v. Driver Pipeline Co., Inc., No. 02-0290, 2004 WL
877536, at *1 (Tex. April 23, 2004).  The
non-breaching party must elect between two courses of action, either continuing
performance or ceasing performance.  Chilton
Ins. Co. v. Pate & Pate Enters., Inc., 930 S.W.2d 877, 887B88 (Tex. App.CSan Antonio 1996,
writ denied).  If the non-breaching party
elects to treat the contract as continuing and insists the party in default
continue performance, the previous breach constitutes no excuse for
nonperformance on the part of the party not in default and the contract
continues in force for the benefit of both parties.  Id. at 887.  Thus, A[t]reating a
contract as continuing, after a breach, deprives the non-breaching party of any
excuse for terminating their own performance.@[7]  Id at 888.

Here, appellant is attempting to avoid
enforcement of the joint venture agreement by claiming EITI=s two prior
breaches excuse him from any further obligation.  First, appellant claims EITI breached the
contract because it did not satisfy the condition precedent of loaning
appellant $18,000.  The agreement
provided the $18,000 loan was a prerequisite to the contract=s validity and was
to become effective September 1, 1995. 
Appellant argues the undisputed evidence proves he did not receive the
full $18,000; thus, according to appellant, the joint venture agreement never
became effective.  








Second, appellant argues EITI breached the
joint venture agreement because its predecessor, Northwest, transferred its
interest in the joint venture to EITI in violation of the non-assignability
clause.  The transfer of interest from
Northwest to EITI began in the early fall of 1995 and was officially
consummated by the board of directors for each entity by the end of the
year.  EITI, however, began fulfilling
the obligations of Northwest under the joint venture agreement in the fall of
1995.  Because each alleged breach
occurred no later than January 1996, we will look at appellant=s conduct from
that point forward to determine whether appellant treated the agreement as
continuing after the alleged breaches had occurred.  

Appellant testified at trial he sent a
letter in May 1996 to EITI=s representatives
informing them he was taking over the billing pursuant to the terms of the
agreement.  Appellant also demanded
payment for one-half of the salary for the physicist, as provided by the
agreement, and, according to appellant, was paid in March 1996 pursuant to
those demands.  EITI continued to receive
billing information from appellant until approximately April of 1996 so EITI
could collect the billings pursuant to the agreement. Additionally, appellant
counterclaimed against EITI for breach of third-party contract, claiming EITI
failed to pay rent obligations, and therefore did not fulfill its obligations
under the agreement.  Appellant also
testified, however, that he did not believe an agreement ever existed because
EITI failed to loan appellant $18,000. 
Despite appellant=s claim at trial that no agreement
existed, he nevertheless testified that he continued to demand EITI=s performance
under the agreement.  We conclude
appellant elected to continue performance of the contract despite believing
EITI breached the agreement.

Even were we to assume both allegations
constitute material breaches of the joint venture agreement, both occurred at
the beginning of the agreement, and the evidence demonstrates  appellant elected to treat the contract as
continuing after the alleged breaches and considered the agreement in full
force and effect.  Because appellant
continued to demand performance, he too was fully obligated to perform under
the agreement.  Therefore, the evidence
establishes as a matter of law appellant=s failure to
comply with the joint 








venture agreement was not excused.  See Chilton Ins. Co., 930 S.W.2d at
887B88.

Appellant also argues the evidence is
legally and factually insufficient to support the jury=s verdict that
appellee did not fail to comply with the joint venture agreement.[8]  Appellant, however, failed to challenge the
legal or factual sufficiency of the evidence to support the jury=s verdict in a
motion for instructed verdict, a motion for judgment notwithstanding the
verdict, an objection to the submission of the issue to the jury, a motion to
disregard the jury=s answer, or a motion for new trial.  Therefore, appellant has waived any
complaints as to the sufficiency of the evidence to support the jury=s finding.  Tex.
R. Civ. P. 324(b); Cecil v. Smith, 804 S.W.2d 509, 510B11 (Tex. 1991). 

Because we hold appellant=s failure to
comply with the joint venture agreement was not excused, we overrule appellant=s second and third
issues.  

Conclusion

Having
overruled appellant=s three issues on appeal, we affirm
the judgment of the trial court.

 

 

 

/s/      John S. Anderson

Justice

 

 

 

Judgment
rendered and Opinion filed June 17, 2004.

Panel
consists of Justices Anderson, Seymore, and Murphy.[9]

 











[1]  42 U.S.C.A. ' 1395nn, entitled Limitation on Certain Physician
Referrals, prohibits a doctor from referring a patient to an entity for
treatment if the doctor retains an ownership interest in that entity. (West
2003).  Thus, in order to comply, the
Texas doctors, all of whom practice in Houston, sold their interest in the
partnership to ensure they could continue to send patients to the clinic.  





[2]  The typical
patient received radiation treatments five days a week over a six to eight week
period. Appellant would not provide the patients= names
to EITI; therefore, EITI withdrew its attempts to evict appellant so that it
did not interfere with appellant=s use of
the premises and ensured continuity in the patient=s treatment.  





[3]  The trial
court generally denied appellant=s motion
for new trial without specifically referring to either motion.  





[4]  Appellant has
named as parties to this appeal EITI and the six
doctors involved in the joint venture agreement.  Appellant, however, only challenges the trial
court=s judgment relating to breach of fiduciary duty.  EITI is the only
party to whom the jury determined appellant breached a fiduciary duty and is
the only party that was awarded damages for such breach.  Accordingly, appellant and EITI are the only
proper parties to this appeal, and the only parties affected by our decision.





[5]  EITI contends  we do not need to decide the issue of
illegality because (1) appellant waived the defense of illegality by not pleading
it at trial, and (2) there was evidence of the existence of a fiduciary
relationship separate and apart from the joint venture agreement.  With regard to waiver, we have reviewed the
record and determine the issue of illegality was tried by consent because the
evidence at trial was developed under circumstances indicating both parties
understood that legality of the joint venture agreement was at issue.  Tex.
R. Civ. P. 67; see Johnston v. McKinney Am., Inc., 9 S.W.3d 271,
281 (Tex. App.CHouston [14th Dist.] 1999, pet.
denied).  Additionally, because we hold
the joint venture agreement is valid, we do not need to determine whether
evidence supports the existence of a fiduciary relationship separate and apart
from the agreement.  





[6]  The provision
found in the predecessor statute to the Medical Practice Act, on which Watt and
Rockett rely, is substantially the same. 
Compare Act
of May 30, 1993, 73rd Leg., R.S., ch. 862, ' 17, 1993 Tex. Gen. Laws 3374, 3388 (repealed and
recodified 1999) with Watt,
303 S.W.2d at 885 (quoting the Texas Medical Practice Act which prohibited A[t]he impersonation of a licensed practitioner, or
permitting, or allowing another to use his license, or certificate to practice
medicine in this State, for the purpose of treating, or offering to treat,
sick, injured, or afflicted human beings@).    





[7]  Although the
non-breaching party must elect between continuing or ceasing performance, the
election does not affect whether the non-breaching party can sue for a former
or future breach.  Cal-Tex Lumber Co.,
Inc. v. Owens Handle Co., Inc., 989 S.W.2d 802, 812 (Tex. App.CTyler 1999, no pet.); see Chilton Ins. Co., 930
S.W.2d at 877B88; Bd. of Regents of Univ. of Tex. v. S & G
Constr. Co., 529 S.W.2d 90, 97 (Tex. Civ. App.CAustin 1975, writ ref=d
n.r.e.).  The election affects only
whether the non-breaching party itself is then required to perform fully.  See Chilton Ins. Co., 930 S.W.2d at
887B88; S & G Constr. Co., 529 S.W.2d at 97. If
the party continues performance, it obligates itself to fully perform.  See Chilton Ins. Co., 930 S.W.2d at
887B88; S & G Constr. Co., 529 S.W.2d at
97.   





[8]  Appellant did
not raise an issue specifically challenging the jury=s finding; however, such an attack is reasonably
inferred from appellant=s second and third issues and his conclusion in which
he requests this court either to reverse and render judgment, or to reverse and
remand the case to the trial court.   See
Tex. R. App. P. 38.1(e)
(providing Aan issue will be treated as covering every subsidiary
question that is fairly included.@) 





[9]  Senior Chief
Justice Paul C. Murphy sitting by assignment.